## STATE v. WILLIAM ELMER WEEKES.

250 N. W. 2d 590.

January 21, 1977—No. 46023.

*C. Paul Jones*, State Public Defender, and *Gregory A. Gaut*, Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *Richard G. Mark,* Assistant Attorney General, *Frederick S. Suhler, Jr.,* and *Gary Hansen,* Special Assistant Attorneys General, and *Thomas Nagel,* County Attorney, for respondent.

Heard before Rogosheske, Peterson, and Scott, JJ., and considered and decided by the court en banc.

ROGOSHESKE, JUSTICE.

Defendant, William Elmer Weekes, was found guilty by a jury of manslaughter in the first degree upon an information charging him with causing the death of a 3-year-old child by an intentional assault of striking the child in the abdomen with his fist with such force and violence that great bodily harm was reasonably foreseeable. Minn. St. 609.20(2).[1] The prosecution's unrefuted medical testimony supported its theory that the child died from internal hemorrhaging as a direct result of the blow described by defendant in an oral statement, which was later transcribed and signed by him and admitted into evidence over his objection. In addition to defendant's claim that the evidence was insufficient to support the jury's guilty verdict, three significant constitutional issues are raised on this appeal from the judgment: (1) Whether custodial confinement of defendant "for investigation" without a warrant and without probable cause constituted an unlawful arrest in violation of Fourth Amendment guarantees; (2) if defendant was unlawfully arrested or confined, whether warnings required by the Fifth Amendment and prescribed by Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602,

---

[1] Minn. St. 609.20 provides in pertinent part: "Whoever does any of the following is guilty of manslaughter in the first degree and may be sentenced to imprisonment for not more than 15 years or to payment of a fine of not more than $15,000, or both:

\* \* \* \* \*

"(2) Causes the death of another in committing or attempting to commit a crime with such force and violence that death of or great bodily harm to any person was reasonably foreseeable, and murder in the first or second degree was not committed thereby \* \* \*."

16 L. ed. 2d 694 (1966), constitute a per se attenuation of the taint of such illegal arrest and confinement in all cases; and (3) whether the record in the instant case is adequate to find that there was sufficient attenuation of the taint of illegal detention to render admissible the inculpatory statements made by defendant after he had been given repeated Miranda warnings. We answer the first issue in the affirmative, and the second, in adherence to Brown v. Illinois, 422 U. S. 590, 95 S. Ct. 2254, 45 L. ed. 2d 416 (1975), and Wong Sun v. United States, 371 U. S. 471, 83 S. Ct. 407, 9 L. ed. 2d 441 (1963), in the negative. Finding the record inadequate to rule on the third issue, we remand for reconsideration by the trial court with directions to conduct such further evidentiary hearings as may be necessary to determine the admissibility of defendant's statement under the guidelines expressed in the Brown case. If the statement is found to be admissible, the conviction is affirmed, if not, a new trial is granted.

Viewing the evidence most favorable to uphold the guilty verdict, as we must, the jury could find that Michael Biel, the 3-year-old son of unmarried Kathleen Biel, died at 4 p. m., April 25, 1974, about 35 minutes after he was brought to the hospital in Litchfield for emergency treatment by his mother and defendant. The post-mortem examination revealed that the cause of death was an acute intra-abdominal hemorrhage, brought on by a 1 centimeter tear in the small bowel mesentary, that filled the child's abdominal cavity with roughtly two-thirds of his blood supply. Defendant was 20 years old at the time of the incident and had been residing with Kathleen and her son in Litchfield since mid-January 1974 following his honorable discharge from the army. They had first met in December 1973 when defendant visited Litchfield on leave. At that time, divorce proceedings to dissolve defendant's first marriage were pending. Following defendant's discharge, he worked at two jobs for brief periods, the last of which terminated in March 1974 when he was hospitalized for a "nervous" condition described as a "seizure or black-out"

problem that was exacerbated by excessive drinking. He frequently babysat Michael during the daytime while Kathleen attended classes at the Willmar technical school. His relationship with Kathleen and her child was such that as soon as his divorce became final, he planned to marry her and adopt Michael.[2]

On the evening of the child's death, April 25, defendant was interviewed by law enforcement officials at Kathleen's home and at the Litchfield Police Department. Most of the interviewing was done by Agent John Barry of the Minnesota Bureau of Criminal Apprehension, who first advised defendant of his Miranda rights. At this time, defendant denied striking the child or in any way hurting him.

During the days which followed, investigations by law enforcement officials continued. On the morning of May 2, defendant was summoned to the office of the sheriff of Meeker County. He appeared voluntarily, and after Miranda warnings were given, defendant was asked by the sheriff whether he had struck the child. Again he denied it. This interview was taped and subsequently transcribed, but was not signed by defendant. For reasons which are not clear from the record, defendant was confined by the sheriff following this interrogation. According to the sheriff, he was detained "for his own protection, and other people," since the sheriff knew that several weeks earlier defendant had been hospitalized for the "seizure and black-out" problem. The following testimony indicates, however, that defendant may have been held merely for investigation:

"Q. So you arrested him for his own protection, is that right?

"A. He wasn't arrested.

"Q. But you put him in jail?

"A. Yes. I was trying to find out what was going on, and I didn't want anything to happen.

"Q. Did you consider him under arrest when you put him in the cell in your jail?

---

[2] Following Michael's death, defendant and Kathleen were in fact married.

"A.    For investigation."

About 4 p. m. on the first day of defendant's confinement, Agent Barry interrogated him again in the commissioner's room at the Meeker County courthouse. Miranda warnings were repeated and defendant continued to deny having anything to do with the child's death. A transcription of this tape-recorded interview was made which defendant did not sign.

In the afternoon of the following day, May 3, defendant after being given another Miranda warning was again questioned by the sheriff. Later that evening, Agent Barry received a call at his home from Kathleen Biel who indicated that defendant wanted to talk to him. After Miranda warnings were twice repeated, defendant gave an oral tape-recorded statement to Agent Barry which was later transcribed. This statement was signed the next day after defendant made an appearance, unrepresented by counsel, before a magistrate where he was further advised of his rights.

The 21-page statement, ruled admissible in pretrial proceedings, was read to the jury at trial and later defendant repeated its contents virtually verbatim while testifying on his own behalf. Both the statement and defendant's testimony revealed that on the night of April 23, 1974 (2 days before the child's death), he had been drinking at a local bar with an old girlfriend. After he had had quite a bit to drink, Kathleen arrived inopportunely and found him talking to her. Kathleen became quite upset and went home. Defendant finally returned home at 12:30 a. m., and stayed up until 3 a. m. trying to resolve his differences with Kathleen.

The next morning defendant remained in bed after Kathleen went to school. Around 8:30, Michael went upstairs and asked him to fix breakfast. Defendant complied and then returned to bed since he was not feeling well. Later at about 10 a. m., the child again awakened defendant, who this time told him to go back downstairs and watch TV or play with his toys. At noon

the child complained that he was hungry and defendant fixed him lunch, after which he returned to bed.

Somtime between 1 and 1:30 that afternoon, Michael returned upstairs and began pulling on the sheets of defendant's bed. He wanted defendant to go downstairs and play, but was told to play by himself. Thereupon the child started crying uncontrollably, and defendant admonished him, "[Q]uit crying or I'm going to spank you." Defendant then arose and dressed while Michael continued to cry. Thereafter, in defendant's own words:

"* * * [Michael] kept crying, and ah, when he didn't stop I was going to slap him on the arm, or by the hand or something, and when I went to slap him, I don't know, know why, but when my hand was coming down, I closed my fist, and I hit him in the stomach."

Michael immediately fell to the floor and in rolling over toppled down the nearby stairs head-first. Defendant ran after the child and placed him on a couch, where he lay quietly watching TV until his mother returned home from school.

That evening and the next morning the child refused to eat, complaining of a stomach ache, and spent the morning sitting on a couch. When his mother returned from school that afternoon, his condition was obviously such as to require medical attention, and he was rushed to the hospital where he died shortly thereafter.

We deem it unnecessary to demonstrate in detail that the direct, circumstantial, and medical opinion evidence compels our holding that the jury could justifiably have found defendant guilty as charged beyond a reasonable doubt in that he intentionally struck the child with such force that great bodily harm or death was foreseeable.

The vexing problem concerns defendant's claim that the admissibility of his signed statement violated his Fourth Amendment rights. The admissibility of the statement was presented and de-

cided at pretrial Rasmussen proceedings.[3] As we read the record of those proceedings, the testimony appears to have been directed at the issue of whether defendant's statements were preceded by adequate Miranda warnings and were made voluntarily, thus making them admissible under Fifth Amendment standards.

While there is little doubt that defendant received adequate Miranda warnings, the question which remains unanswered from our review of the Rasmussen record is whether defendant's Fourth Amendment rights were also protected. Assuming the sheriff's utmost good faith in his judgment that defendant should be confined for the "protection" of himself and others or held for "investigation," it is nevertheless clear that defendant was taken into custody and confined without a warrant and without probable cause in violation of Fourth Amendment guarantees, for absent probable cause there is not and never has been any lawful basis for "holding" a person "for investigation" or "on suspicion." Davis v. Mississippi, 394 U. S. 721, 89 S. Ct. 1394, 22 L. ed. 2d 676 (1969); State v. Mitchell, 285 Minn. 153, 172 N. W. 2d 66 (1969). Indeed this is the very essence of the protection afforded by the Fourth Amendment freedom of "[t]he right of the people to be secure in their persons" against unreasonable seizures of both physical and verbal evidence which may be used in a criminal prosecution. Wong Sun v. United States, 371 U. S. 471, 83 S. Ct. 407, 9 L. ed. 2d 441; Mapp v. Ohio, 367 U. S. 643, 81 S. Ct. 1684, 6 L. ed. 2d 1081 (1961).

Where as here an illegal arrest and confinement has occurred the admissibility of a subsequent incriminating statement is to be determined by whether such statement is "sufficiently an act of free will to purge the primary taint of the unlawful invasion" in light of the policies served by the Fourth Amendment exclusionary rule, rather than the Fifth Amendment protection against self-incrimination. Wong Sun v. United States, 371 U.

---

[3] See, State ex rel. Rasmussen v. Tahash, 272 Minn. 539, 141 N. W. 2d 3 (1965).

S. 486, 83 S. Ct. 416, 9 L. ed. 2d 454; Brown v. Illinois, 422 U. S. 590, 598, 95 S. Ct. 2254, 2259, 45 L. ed. 2d 416, 424.

In the Brown case, decided 8 months after the trial court's decision in the present appeal, the defendant had been illegally arrested at gunpoint for murder by detectives of the Chicago police force without a warrant and without probable cause. Within 2 hours after Brown's arrest he had made the first of two incriminating statements that were later used against him at trial. Following conviction, the Supreme Court of Illinois affirmed on the ground that the Miranda warnings, which had preceded both confessions, were sufficient per se to purge the primary taint of the unlawful arrest.

In reversing the conviction, the United States Supreme Court held that the admissibility of incriminating statements obtained without a warrant is a Fourth Amendment question, and that Miranda warnings which offer Fifth Amendment protection do not in themselves substantially purge the taint of an illegal arrest and detention. Rather, the crucial question is whether on the facts of each case the inculpatory statement is the product of the accused's free will tested by whether the connection between the illegal arrest and detention and the statement has been so attenuated as to dissipate the taint of the initial illegality. The court declared that although "the Fifth Amendment is in 'intimate relation' with the Fourth" and while the two often appear to "coalesce," the exclusionary rule under the Fourth Amendment "serves interests and policies that are distinct from those it serves under the Fifth [which] is directed at all unlawful searches and seizures, and not merely those that happen to produce incriminating material or testimony as fruits." 422 U. S. 601, 95 S. Ct. 2260, 45 L. ed. 2d 425. Even though adequate Miranda warnings avoid the exclusionary rule sanctions under the Fifth Amendment, such warnings do not in any way inform the accused of Fourth Amendment rights, which include the right to be released from unlawful custody following arrest and confinement without a warrant or probable cause. Thus, if the Miranda

warnings could in all cases be used as a "cure-all" for an illegal arrest, law enforcement officers would be encouraged to disregard the guaranties of the Fourth Amendment with impunity, eviscerating its protective scope.

In elaborating the criteria that are to be followed when considering the admissibility of an inculpatory statement under Fourth Amendment standards, the court noted (422 U. S. 603, 95 S. Ct. 2261, 45 L. ed. 2d 427):

"* * * No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismatic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, * * * and, particularly, the purpose and flagrancy of the official misconduct are all relevant. * * * The voluntariness of the statement is a threshold requirement. * * * And the burden of showing admissibility rests, of course, on the prosecution."

Because of the claimed similarity of the facts in the instant case to those of Brown, we are urged by defendant to hold his statements inadmissible and to set aside his conviction. Conversely, the state urges that because the facts and circumstances of Brown are distinguishable and the evidence supports the guilty verdict, we should affirm defendant's conviction. We are not persuaded to do either. The state has now finally conceded that our review must begin with the premise that defendant was unlawfully confined and detained in jail for more than 34 hours before his oral statement. We must also on this record agree with defense counsel that the question of the legality of defendant's arrest and confinement was raised by defendant's general motion to suppress the statements and that the transcribed signed state-

ment is the fruit of defendant's oral statement. However, it is apparent from the Rasmussen record that the question of whether defendant's statements were admissible under Fourth Amendment standards was not expressly presented or decided by the trial court. To affirm the conviction would not only require that we ignore the above and other deficiencies in this record but would also provoke defendant to raise the issue by collateral attack in a postconviction proceeding where his testimony and other relevant evidence not included in this record would undoubtedly be presented. On the other hand, to reverse the conviction in the face of the evidence, including defendant's statements which, if admissible, would support his conviction, would in our opinion offend procedural due process to the state by precluding the opportunity not previously afforded of carrying the burden of proof to establish that defendant's statements were an intervening, independent act of his free will.

We conclude that the alternative which best serves the administration of justice is to remand this case for a redetermination of the admissibility of defendant's statements under the Brown criteria. Attention should be directed on remand to whether the intervening facts and circumstances were such as to purge the primary taint of defendant's illegal arrest and detention. Testimony and evidence covering the treatment of defendant while confined, his relationship with his interrogators, and his freedom of communication with persons other than law enforcement officers would be particularly relevant. Should the trial court, after a rehearing, find that defendant's statements were an intervening, independent product of his free will so as to dissipate the taint of his illegal detention and confinement, his conviction is affirmed; otherwise, a new trial is granted.

Remanded with directions.

PETERSON, JUSTICE (concurring specially).

I concur in the remand of this case for proceedings to fully determine whether defendant's statements made to the police of-

ficers were an intervening, independent product of his free will so as to dissipate the taint of his patently illegal detention. Even so, however, there is substantial evidence on this record, unless otherwise refuted, which would establish that the subsequent confession was untainted by the confinement. On the evening of May 3, following the inception of his confinement, it appears from this record that Kathleen Biel, mother of the deceased child, contacted John Barry, an agent for the Minnesota Bureau of Criminal Investigation, and indicated that defendant wished to talk to him. Barry, after again advising defendant of his constitutional rights, received and transcribed defendant's statement, which defendant signed the next day, May 4.[1] At no time did defendant indicate that he had in any way been coerced into making his statement. At trial, moreover, defendant took the stand in his own defense and repeated virtually verbatim the contents of his statement to Agent Barry.

---

[1] The lapse of time is itself significant in distinguishing this case from the situation in Brown v. Illinois, 422 U. S. 590, 95 S. Ct. 2254, 45 L. ed. 2d 416 (1975). In Brown the defendant had made the first of two incriminating statements within 2 hours after his illegal arrest. Here the intervening period of time was closer to 2 days. The United States Supreme Court in Brown (422 U. S. 603, 95 S. Ct. 2261, 45 L. ed. 2d 427) had indicated that the "temporal proximity of the arrest and the confession," as well as the giving of Miranda warnings, were among the circumstances to be considered in assessing the admissibility of the statements.