STATE of Minnesota, Respondent,

v.

William Elmer WEEKES, Appellant.

No. 47712.

Supreme Court of Minnesota.

April 7, 1978.

C. Paul Jones, Public Defender, Gregory Gaut, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., Jane Prohaska, Sp. Asst. Atty. Gen., St. Paul, Thomas Nagel, County Atty., Litchfield, for respondent.

Heard before PETERSON, YETKA, and IVERSON, JJ., and considered and decided by the court en banc.

YETKA, Justice.

Defendant was charged with feloniously causing the death of one Michael T. Biel in the city of Litchfield, Minnesota, in April 1974. The case was tried before a jury in the Meeker County District Court, where defendant was found guilty of manslaughter in the first degree.

Defendant initially appealed from the judgment of conviction in June 1975. In that first appeal appellant challenged the legal sufficiency of the evidence supporting that verdict and the admissibility of his inculpatory statements given to law-enforcement officials after an illegal arrest.

This court, in *State v. Weekes,* Minn., 250 N.W.2d 590, 593 (1977), disposed of defendant's first claim of error by finding that the "direct, circumstantial, and medical opinion evidence compels our holding that the jury could justifiably have found defendant guilty as charged." However, deficiencies in the record prevented this court from fully deciding whether his confession was properly admitted into evidence. The court remanded the case to the district court for a redetermination of the admissibility of appellant's statements under guidelines set down in its opinion. This court concluded that (Minn., 250 N.W.2d 595):

> " * * * Should the trial court, after a rehearing, find that defendant's statements were an intervening, independent product of his free will so as to dissipate the taint of his illegal detention and confinement, his conviction is affirmed; otherwise, a new trial is granted."

In accordance with this court's directive, an evidentiary hearing was held on March 21, 1977, in the Meeker County District Court. Following that hearing, the court concluded that defendant's inculpatory statements were made of his own free will and uninfluenced by his incarceration.

Defendant now again appeals the conviction, seeking review in light of the new evidence heard in the district court.

The issue before the court in this second appeal is whether the statements made by defendant should be excluded as the fruit of an illegal arrest so as to require a new trial, or whether those inculpatory statements were sufficiently an act of his independent free will so as to purge them of the primary taint of his illegal detention and so justify the prior conviction. We reverse and remand for a new trial.

In the original appeal of this case, *State v. Weekes, supra,* this court has substantially set forth the circumstances surrounding the death of Michael Biel, and there is no need to repeat those facts here. For purposes of this appeal it is necessary to set out the facts of the investigations and interrogations of defendant, his illegal arrest, and the facts surrounding the making of his inculpatory statements.

On Wednesday, April 24, 1974, the date of Michael Biel's death, the police conducted an initial investigation and questioned defendant at the Litchfield police station. *Miranda* warnings were read to defendant at this time. Defendant waived his constitutional rights and denied any knowledge of what might have happened to Michael Biel to cause his death. Defendant was then allowed to leave and went to his parents' home in South Haven, Minnesota.

Defendant was not contacted by law-enforcement officials again until the morning of Thursday, May 2, 1974. On that date, defendant was at the home of Katherine Weekes [1] in Litchfield where they were packing Katherine's things so that she could join defendant at South Haven.

As they were loading the car, Deputy Sheriff Russell Dibb came to the home and informed defendant that Sheriff John Rogers wanted to talk to him concerning Michael Biel's death. Defendant testified that he believed he had no choice but to go with

---

1. At the time of these events, Katherine Weekes was known by her maiden name, Katherine Biel, the mother of the deceased child, Michael Biel. Katherine and defendant were married on July 29, 1974.

Officer Dibb. The sheriff, however, testified that he had previously spoken with Katherine Weekes about the possibility of having defendant come down to the sheriff's office for another interview. When he learned that appellant was in Litchfield, the sheriff asked Officer Dibb to bring defendant to his office. Defendant was neither searched nor handcuffed before he rode with the deputy to the sheriff's office.

At 11 a. m. that day, Sheriff Rogers interviewed defendant in his office in the presence of Mary Kalkbrenner, the sheriff's secretary. After advising him of his *Miranda* rights, the sheriff questioned him about Michael Biel, whom defendant denied harming in any way. The sheriff also questioned defendant about his medical history. Sheriff Rogers had been acquainted with defendant for some time and was aware of the fact that he had a history of seizures and blackouts which had occasionally required hospitalization. Defendant stated that he had such a seizure several weeks before the death of the child, but there was no claim that defendant had any such seizure immediately prior to the incident in question.

Sheriff Rogers and defendant additionally discussed at this time whether he would consent to taking a lie detector test. Defendant agreed to take the test and the sheriff then explained to him that he would have to remain at the county jail until the test could be scheduled. Defendant was later informed that the test could not be given until Monday, May 6, 1974.

Sheriff Rogers testified that his decision to detain defendant was two-fold. First, he wanted to hold him for investigation in connection with the child's death. Secondly, he stated that he was concerned about the defendant's seizure problem. When questioned further about this, Sheriff Rogers admitted that incarceration for a medical problem was probably not the best approach to this situation and stated that perhaps hospitalization, or at least a medical examination would have been more appropriate.

Defendant was photographed and fingerprinted. He was then placed alone in a single cell, isolated from any other prisoners. When asked if he felt that incarceration in a one-man cell might aggravate defendant's condition, the sheriff responded that he "never gave it that much thought," but that this was the reason he and others kept a close watch on defendant.

The sheriff stated that he brought the defendant many of his meals and also came to his cell on several other occasions as well to check on him. Defendant testified that on these occasions when the sheriff came to his cell, he would stay and talk, asking him questions about Michael's death.

At about 3:15 p. m. that same afternoon, defendant was taken from his cell and interrogated by agents John Barry and Les Loch of the Bureau of Criminal Apprehension. After reading *Miranda* rights to defendant, agent Barry questioned him about the child's death and about defendant's medical history. Defendant continued to deny any wrongdoing and the questioning was ended at around 4:15 p. m.

That same day, Katherine Weekes and Dolly Weekes, defendant's mother, learned that defendant was in jail and went there to see him. Both were denied admission.

Sheriff Rogers stated that their appearance at the jail did not coincide with the officially scheduled visiting hours. That night, Katherine Weekes went to the jail and talked with defendant from the street through the open window of his ground-level jail cell. Sheriff Rogers stated that he was aware of this unauthorized visit, but did nothing to prevent the two from talking. The two talked for only a few minutes.

Defendant made no phone calls and did not appear in court or consult with an attorney during his first day of incarceration.

According to the sheriff, visiting hours in his jail are Tuesdays and Fridays from 2 to 4 o'clock in the afternoon. Doctors, clergymen, and attorneys are allowed at almost any time, however. Katherine Weekes testified that she tried to visit appellant again

on Friday, May 3, 1974, because she was told of these visiting hours. She was again denied admission. That same day, Robert Wells, who was married to defendant's sister, and Reverend Rolland Reed, pastor of the Faith Baptist Church of Anoka, drove to the Litchfield jail to visit defendant. The sheriff told Mr. Wells that he would not allow him to visit. Rev. Reed, however, was allowed to visit the defendant from 30 to 45 minutes. Rev. Reed has a doctorate in clinical psychology and at the remand hearing was allowed to testify as to his opinion of defendant's mental and emotional state. He stated that defendant did not seem to have a clear understanding of his situation. He described defendant's condition as disassociation reaction psychosis and opined that defendant's incarceration contributed to this highly emotional state of mind. The trial judge, in his findings, stated he was largely unimpressed with Rev. Reed's testimony.

During this second day of incarceration, Sheriff Rogers formally interrogated defendant once again. Defendant was given his *Miranda* rights, and he agreed to talk to the sheriff. Once again he maintained that he had nothing to do with the death of Michael Biel.

After dark that evening, Katherine Weekes again talked to defendant through his jail cell window. She stated that he was upset and crying and told her that the sheriff had been at his cell talking to him all day and that he felt pressured by him. He stated that he did not like talking to Sheriff Rogers, but that if he had to talk to anyone, he would rather talk to Agent Barry of the Bureau of Criminal Apprehension. Both Katherine Weekes and defendant testified that defendant did not ask to see Agent Barry. Nevertheless, Katherine Weekes called Agent Barry that night and asked him to go and talk to defendant. She stated that she had called Barry because she felt defendant needed someone to talk to because he seemed so upset, and they would not let her in to talk to him. After calling Barry, she returned to the jail window to tell defendant what she had done. Defendant testified that he was upset that she called Agent Barry, but told her not to worry about it. He indicated that he said this because he did not want her to think he was mad at her.

After being contacted by Mrs. Weekes, Agent Barry then left his home to visit defendant in his cell. Defendant testified that when Barry came to his cell that night, he told him he did not want to talk with him. Agent Barry denies that defendant said this and testified only that the defendant stated he was confused and that he said he did not know if he were really guilty or not. Barry stated that he gave defendant his *Miranda* rights, and a lengthy interrogation ensued in which defendant ultimately made his inculpatory statements. From the time of his original confinement until the time of his ultimate confession, defendant had been incarcerated over 34 hours.

Defendant remained in his cell until the next morning, Saturday, May 4, 1974, when defendant appeared before the judge of county court for an initial appearance on a charge of manslaughter. That same morning, Katherine Weekes was allowed to visit defendant in his cell. In the afternoon, defendant signed a 21-page transcript of his confession taken by Agent Barry the previous night.

■ In *State v. Weekes, supra,* this court held that the arrest and detention of defendant in this case were clearly illegal and violated his Fourth Amendment rights (Minn., 250 N.W.2d 595). Quoting from *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), this court set forth factors to consider in order to determine whether the taint of an illegal arrest can be purged, rendering a confession during an illegal confinement admissible. Those factors are:

(1) Whether *Miranda* warnings were given;

(2) The temporal proximity of the arrest and the confession;

(3) The presence of any intervening circumstances;

(4) The purpose and flagrancy of the official misconduct;

(5) The treatment of defendant while confined;

(6) His relationship with his interrogators; and

(7) His freedom of communication with persons other than law-enforcement officers.

■ No one factor provides a certain guide. One must balance all of these factors and attempt to determine whether the illegal arrest was a proximate contributing cause of the confession. In other words, the test by which we must review this case is whether defendant's statements were obtained by an exploitation of his illegal arrest, or whether the confession was an *independent* product of defendant's free will. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Brown v. Illinois, supra.*

■ It is essential to note that not only must a confession which is obtained after an illegal arrest be voluntary under the Fifth Amendment, it also must be free of the taint of Fourth Amendment violations. Voluntariness, then, is not the only factor this court must look for. The confession must be given independently of the primary illegality, such that the connection between the illegal arrest and the confession is sufficiently tenuous so as to purge that taint.

■ The evidence presented by the state was wholly inadequate to meet its burden of proving the confession admissible.[2] The admittedly proper *Miranda* warnings and lack of physical abuse do not support the

trial court's findings in light of the overwhelming weight of the other factors which the trial court was required to consider.[3]

It is clear that the defendant's confession was the product of an illegal 34 hour confinement during which he was repeatedly questioned. Rather than attenuating the taint of the illegal arrest, the length of the confinement and the continued questioning compounded the illegality. In two cases cited approvingly by the majority in *Brown v. Illinois, supra*, confinements in excess of 40 hours did not serve to purge confessions of the taint of illegal arrests.[4] As stated in *U. S. ex rel. Gockley v. Myers*, 450 F.2d 232, 238 (3 Cir. 1971), certiorari denied, 404 U.S. 1063, 92 S.Ct. 738, 30 L.Ed.2d 732 (1972):

> " * * * the wrong in this case, the 'taint,' is not merely the illegality of the arrest but also *the illegality of the continuing detention pursuant to the illegal arrest for the purpose of controlled, persistent and repeated questioning. * * * *"* 450 F.2d 238. (Italics supplied.)

No intervening circumstances occurred in this case which are generally recognized as sufficient to purge the taint of an illegal arrest. There was no appearance before a magistrate;[5] there was no release and subsequent voluntary return to confess;[6] there was no consultation with an attorney.[7] This is, in part, the result of an archaic system of court appointment of defense counsel. This case would never have come here had a full-time public defender been present to monitor admissions to the county jail.[8]

---

2. *Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416, 427 (1975); *State v. Weekes*, Minn., 250 N.W.2d 590, 595 (1977).

3. Although it is admitted that the police committed no brutal or physically coercive acts, the United States Supreme Court has clearly recognized the "compulsion inherent in custodial surroundings." *Miranda v. Arizona*, 384 U.S. 436, 458, 86 S.Ct. 1602, 1619, 16 L.Ed.2d 694, 714 (1966). The evidence presented to the trial court presents a pattern of constant pressure and interrogation by the police.

4. *Hale v. Henderson*, 485 F.2d 266 (6 Cir. 1973), certiorari denied, 415 U.S. 930, 94 S.Ct. 1442, 39 L.Ed.2d 489 (1974); *United States ex rel.*

*Gockley v. Myers*, 450 F.2d 232 (3 Cir. 1971), certiorari denied, 404 U.S. 1063, 92 S.Ct. 738, 30 L.Ed.2d 752 (1972).

5. *Johnson v. Louisiana*, 406 U.S. 356, 365, 92 S.Ct. 1620, 1626, 32 L.Ed.2d 152, 161 (1972).

6. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

7. *Commonwealth of Pennsylvania v. Maroney*, 348 F.2d 22 (3 Cir. 1965).

8. Defendant apparently believed that a member of the county attorney's staff would be appointed to represent him. We note that this is only one of two districts in the state where judges have elected not to have a public defender.

Although defendant was reluctantly allowed to see a minister, Katherine Weekes, his mother, and defendant's brother-in-law were all denied admittance to the jail. The fact that Katherine Weekes was allowed to visit after the confession and at a time not set aside for visitors emphasizes the sheriff's determination to keep defendant from communicating with persons outside the jail until he confessed.

The most important factor in the determination that the confession was illegally obtained was the flagrant nature of the police action. In *State v. Weekes*, Minn., 250 N.W.2d 590, 594, we stated:

"* * * Assuming the sheriff's utmost good faith in his judgment that defendant should be confined for the 'protection' of himself and others or held for 'investigation,' it is nevertheless clear that defendant was taken into custody and confined without a warrant and without probable cause in violation of Fourth Amendment guarantees, for absent probable cause there is not and never has been any lawful basis for 'holding' a person 'for investigation' or 'on suspicion.' *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *State v. Mitchell*, 285 Minn. 153, 172 N.W.2d 66 (1969). Indeed this is the very essence of the protection afforded by the Fourth Amendment freedom of '[t]he right of the people to be secure in their persons' against unreasonable seizures of both physical and verbal evidence which may be used in a criminal prosecution. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)."

This factor was examined at length by Mr. Justice Powell in his concurring opinion in *Brown v. Illinois*, 422 U.S. 590, 610, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416, 431, in which he stated:

"I would require the clearest indication of attenuation in cases in which official conduct was flagrantly abusive of Fourth Amendment rights. If, for example, the factors relied on by the police in determining to make the arrest were so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or if the evidence clearly suggested that the arrest was effectuated as a pretext for collateral objectives, * * * or the physical circumstances of the arrest unnecessarily intrusive on personal privacy, I would consider the equalizing potential of *Miranda* warnings rarely sufficient to dissipate the taint. In such cases the deterrent value of the exclusionary rule is most likely to be effective, and the corresponding mandate to preserve judicial integrity, * * * most clearly demands that the fruits of official misconduct be denied. I thus would require some demonstrably effective break in the chain of events leading from the illegal arrest to the statement, such as actual consultation with counsel or the accused's presentation before a magistrate for a determination of probable cause, before the taint can be deemed removed * * *."

The Fourth Amendment violations which occurred here were not merely technical, because the sheriff's explanations reveal no probable cause for the illegal arrest and detention.

One major purpose for the exclusionary rule is deterrence of illegal police conduct by removing incentives to the illegality. *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). Were we to affirm the trial court the effect would be to render admissible any confession made after an illegal detention where police conduct falls short of overt physical brutality. To say, as does the state, that the defendant's confession was the result of remorse is merely to say that his will was overcome by the confinement. Affirmance would serve to encourage police disregard of constitutional procedures, to encourage exploitation of illegal confinements, and to increase public cynicism about law enforcement agencies.

Law and order require the police as well as citizens to refrain from illegal activities. While we in no way condone the acts com-

mitted by defendant, the police failure to abide by constitutional restraints mandates a reversal in this case. The confession must be excluded in any retrial.

Reversed and remanded.

IRVING C. IVERSON, Justice * (dissenting).

I respectfully dissent from the opinion of the majority.

This court concluded in the initial appeal of this case, *State v. Weekes*, Minn., 250 N.W.2d 590, 595 (1977), that—

" * * * [s]hould the trial court, after a rehearing, find that defendant's statements were an intervening, independent product of his free will so as to dissipate the taint of his illegal detention and confinement, his conviction is affirmed; otherwise, a new trial is granted."

It is fundamental that upon an appeal from the findings of fact, conclusions of law, and judgment of a trial court, the findings of the trial court will not be set aside by the appellate court unless the findings of the trial court are *clearly erroneous.* This basic principle is religiously followed by the courts as well when consideration is given to the reversal of a jury verdict. The rationale of the principle is based upon the commonsense realization by appellate courts that the trial judge or the jury as trier of fact is in a better position to evaluate the testimony of witnesses than the appellate court where the review of testimony and other evidence is made on the basis of a "cold, written record."

The majority opinion in no respect discloses any departure by the trial judge from the "guidelines" set forth in the initial appeal and remand in the trial court's conduct at the remand hearing.

The lengthy incarceration following the illegal arrest, we must all condemn. The majority opinion stresses the fact that the mother of the deceased child as well as the brother-in-law of the defendant were denied visitation with the defendant. This should not be of much moment. Having in mind that at the time of the incarceration neither of those visitors were related to the defendant, their exclusion from visitation was no doubt justified. Reasonable restrictions on visitation by nonrelatives would seem appropriate. This would be particularly appropriate here where the deceased infant's mother, unrelated to defendant at the time, sought visitation with defendant, the prime suspect in the case.

The length of the incarceration (34 hours) appears to be the sole factor which the majority finds as a basis for its reversal and the granting of a new trial. All of the other factors explored by the trial judge at the rehearing led to the conclusion by the trial court that the "taint of the illegal detention" had been purged.

If the findings of the trial court are to be summarily reversed upon that sole ground, the court in the opinion of the dissent should have reversed the conviction at the time of the initial appeal and granted a new trial.

The trial court's findings, under the guidelines laid down in the initial opinion of this court, having been scrupulously adhered to, and with the added advantage of having the witnesses before it for proper evaluation, should be affirmed and the conviction should be allowed to stand.

PETERSON, Justice (dissenting).

I join in the dissent of IVERSON, J.

---

* Acting as Justice of the Supreme Court by appointment pursuant to Minn.Const. art. 6, § 2, and Minn.St. 2.724, subd. 2.