**STATE of Minnesota, Respondent,**

v.

**Daniel James BERGERSON, Appellant.**

**No. C2–02–932.**

Court of Appeals of Minnesota.

April 15, 2003.

Charles A. Ramsay, Rebecca Rhoda Fisher, Ramsay, DeVore, & Olson, P.A., Roseville, for appellant.

Mike Hatch, Attorney General, Amy J. Woodworth, Assistant Attorney General, St. Paul, and Jeffrey R. Edblad, Isanti County Attorney, Isanti, for respondent.

Considered and decided by RANDALL, Presiding Judge, SHUMAKER, Judge, and WRIGHT, Judge.

## OPINION

WRIGHT, Judge.

Appealing from his conviction of fifth-degree controlled substance crime, appellant Daniel Bergerson argues that police lacked reasonable, articulable suspicion to stop his vehicle after driving away from a hardware store in which the owner had reported Bergerson's purchase of two commonly sold items with lawful uses that also can be used along with other items to manufacture methamphetamine. Bergerson also argues that the evidence seized should be suppressed as fruit of the illegal seizure. We reverse.

## FACTS

On November 14, 2000, the owner of a hardware store in Cambridge called the police to report that an individual had purchased rubber tubing and acetone, commonly sold items that can be used to manufacture methamphetamine. Cambridge Police Officers Todd Schuster and Jason Harvey and Isanti County Sheriff's Deputy Kevin Carlson were dispatched to the store. Officer Schuster arrived first and saw an individual, later identified as Bergerson, getting into a red Chevy Beretta.

Officer Schuster spoke with the store-owner, who identified Bergerson as the person who had purchased the items. By

the time Officer Schuster finished talking with the owner, Bergerson was driving out of the store's parking lot. Officer Schuster requested that Deputy Carlson and Officer Harvey stop the vehicle, identify the driver, and determine his intentions.

Deputy Carlson testified that, as Bergerson proceeded westbound on highway 95, Bergerson's vehicle did not exceed the speed limit. With Bergerson's vehicle directly in front of his squad car, Deputy Carlson attempted to pull it over by activating his flashing red lights. Bergerson did not stop immediately and continued driving while other cars began pulling over. Deputy Carlson then shined his spotlight into the back of Bergerson's vehicle, "[t]o make sure the person knew I was trying to stop him." Deputy Carlson observed Bergerson "reaching towards the front passenger floor or look[ing] like he was putting stuff in the back seat, and it appeared suspicious, as furtive movement." Deputy Carlson then activated his squad car's siren.

After Bergerson had traveled approximately one mile beyond the point where Deputy Carlson activated his flashing lights, he stopped the vehicle abruptly, exited it, and ran through a ditch. During the subsequent pursuit, Bergerson fell and Officer Harvey was able to restrain him. Bergerson was arrested and pat searched. Red phosphorus, a substance used in the manufacture of methamphetamine, was recovered from Bergerson's jacket pocket.

Meanwhile, Officer Schuster drove to the location where Bergerson had stopped his car and observed several items inside the vehicle, including coffee filters, distilled water, paper towels, a black Nike bag, and a briefcase. Officer Schuster obtained a search warrant for Bergerson's vehicle. Upon executing the search warrant the next morning, Officer Schuster seized a handgun and a substance, which tested positive for methamphetamine.

Bergerson was charged with felony controlled substance crime in the fifth degree, in violation of Minn.Stat. §§ 152.025, subd. 2(1)(2000), and 609.11, subd. 5 (2000), and felony fleeing a peace officer in a motor vehicle, in violation of Minn.Stat. § 609.487, subd. 3 (2000). Following a contested omnibus hearing, the district court denied Bergerson's motion to suppress the evidence seized. The state dismissed the latter charge, and the case was submitted on stipulated facts, pursuant to *State v. Lothenbach*, 296 N.W.2d 854 (Minn.1980). Bergerson was convicted of the remaining charge. This appeal followed.

## ISSUES

1. Was the stop of appellant's vehicle supported by reasonable, articulable suspicion?

2. Should the evidence seized have been suppressed as fruit of an illegal seizure?

## DECISION

■ When reviewing a pretrial order denying a motion to suppress evidence where the facts are undisputed and the trial court's decision is a question of law, we independently review the facts and determine as a matter of law whether the evidence must be suppressed. *State v. Othoudt*, 482 N.W.2d 218, 221 (Minn.1992).

### I.

■ The Fourth Amendment of the United States Constitution and Article I, Section 10, of the Minnesota Constitution protect against unreasonable searches and seizures. To conduct a stop for limited investigatory purposes, an officer must have reasonable, articulable suspicion of criminal activity. *State v. Munson*, 594

N.W.2d 128, 136 (Minn.1999) (citing *Terry v. Ohio,* 392 U.S. 1, 20–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968)).

The police must only show that the stop was not the product of mere whim, caprice or idle curiosity, but was based upon "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."

*State v. Pike,* 551 N.W.2d 919, 921–22 (Minn.1996) (quoting *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880).

Bergerson argues that, without more, his purchase of rubber tubing and acetone at the hardware store was insufficient to provide Carlson with reasonable, articulable suspicion of criminal activity to lawfully stop his vehicle. The state does not dispute that a stop based solely on the purchase of legal items is invalid. But the state asserts that, when Bergerson failed to pull over in response to Carlson's red flashing lights, spotlight, and siren, an investigative stop was justified.

■■■■ Reasonable, articulable suspicion must be present at the moment a person is seized. *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1880; *see also State v. Cripps,* 533 N.W.2d 388, 391 (Minn.1995) (citing *Florida v. Royer,* 460 U.S. 491, 497–98, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229, (1983)).

[A] person has been seized if in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was neither free to disregard the police questions nor free to terminate the encounter.

*Id.; see United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *In re Welfare of E.D.J.,* 502 N.W.2d 779, 781–82 (Minn. 1993). When, under the totality of circumstances, a reasonable person would believe that, because of the conduct of the police, he or she was not free to leave, then a "seizure" has occurred, and "the police must be able to articulate reasonable suspicion justifying the seizure." *E.D.J.,* 502 N.W.2d at 783. In analyzing the Article I, Section 10, of the Minnesota Constitution, the Minnesota Supreme Court has declined to follow *California v. Hodari,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690, (1991), which found seizure occurs only when police use physical force to restrain an individual or when a person submits to a show of authority by police. *E.D.J.,* 502 N.W.2d at 781. Our analysis, therefore, is not limited to those occasions when the party yields to the officer's show of authority.

Deputy Carlson activated his flashing red lights after following immediately behind Bergerson for some time. Under certain circumstances, an officer's flashing red lights can be a significant factor in determining whether a seizure has occurred. *See State v. Sanger,* 420 N.W.2d 241, 243 (Minn.App.1988) (holding that officer "boxing in [suspect's] car, then activating his squad's flashing red lights and honking his horn" created a seizure); *cf. State v. Hanson,* 504 N.W.2d 219, 219–20 (Minn.1993) (concluding there was no seizure where officer, suspecting no criminal activity, activated flashing red lights upon approaching already stopped car). A driver confronted with a trailing squad car with flashing red lights inevitably feels duty bound to submit to this show of authority by pulling over until the officer makes it clear that either the driver is not the target of interest or the driver's encounter with the police has come to a conclusion. After ascertaining that a squad car's flashing lights are intended to communicate with him or her, no reasonable driver would believe that he or she is free to disregard or terminate the encounter with police. Here, where Bergerson's

vehicle was directly in front of Deputy Carlson's squad car with its red lights flashing, we conclude that Bergerson was seized.

We find support for our conclusion in *E.D.J.*, in which the Minnesota Supreme Court analyzed when a seizure occurred. 502 N.W.2d at 781–84. In that case, officers pulled up behind three individuals, including E.D.J., and ordered them to stop without the requisite reasonable, articulable suspicion of criminal activity. *Id.* at 780. Two men stopped immediately, but E.D.J. took five steps, dropped cocaine, took two more steps, and then turned around. *Id.* Holding that E.D.J. was seized at the point when police directed him to stop, the supreme court held that the cocaine must be suppressed, because E.D.J. dropped the cocaine after the illegal seizure. *Id.* Just as E.D.J. continued walking after the officer told him to stop, Bergerson continued to drive after Carlson directed Bergerson to stop by trailing Bergerson's car and activating the squad car's flashing red lights. The supreme court's ruling in *E.D.J.* leads us to hold that Bergerson was seized once Carlson, while trailing Bergerson's car, activated the squad's flashing lights.

■ Having established the point of seizure, we proceed with the analysis of whether, at that moment, Deputy Carlson had reasonable suspicion to stop Bergerson. Prior to the seizure, Deputy Carlson knew only that Bergerson had purchased common, everyday items from the hardware store that can also be used for an unlawful purpose. Deputy Carlson had not yet seen Bergerson's furtive movements, so we must exclude them from the analysis. Absent any other activity or information about Bergerson, merely purchasing two generic items from a hardware store, which separately and together have numerous legitimate uses, does not

create reasonable suspicion of criminal activity. *Munson,* 594 N.W.2d at 136.

Here, the facts are distinguishable from those presented in *State v. Vereb,* 643 N.W.2d 342 (Minn.App.2002), in which we rejected the claim that the police unconstitutionally stopped an individual they suspected of producing methamphetamine. *Id.* at 349. In *Vereb,* a Wal–Mart employee notified police that two individuals had made several trips to purchase a large quantity of cold tablets. *Id.* at 345. Aware that cold tablets are often used to produce methamphetamine, the police chief responded to the call, spoke with the employee, and began following the vehicle of the individuals who had purchased the tablets. *Id.* The individuals sped away from the police chief at over 75 miles per hour, but were apprehended by another officer. *Id.* We held that reasonable, articulable suspicion supported the stop:

> [W]e conclude that police had reasonable suspicion of criminal activity to support the stop of the vehicle, based on the following facts: (1) Chief Pender received a report from a Wal–Mart employee who observed two men purchasing a large number of cold tablets; (2) Chief Pender knew that cold tablets are precursor materials commonly used in the production of methamphetamine; (3) when Chief Pender arrived at the store, an employee met him and told him that the men had just left in a vehicle; (4) the employee observed the direction the vehicle had traveled and rode along with Chief Pender to search for the vehicle; and (5) Chief Pender observed the vehicle attempting to evade his pursuit by traveling at excessive speeds.

The speeding violation and evasive driving conduct alone justified the stop. These facts, coupled with appellant's and [another individual's] other suspicious conduct at the store, provided a reason-

able articulable basis to stop the vehicle to investigate a possible traffic or controlled substance violation.

*Id.* at 347 (citations omitted).

*Vereb* is distinguishable from the instant case in two respects. First, the quantity and nature of the purchases made by the suspects in *Vereb* are different from those made by Bergerson. Repeated purchases of large quantities of cold tablets by the same two people are palpably more suspicious and suggestive of illegal activity than a single purchase of rubber tubing and acetone by an unknown individual. Although, as these cases demonstrate, merchants are becoming increasingly aware of the components necessary to manufacture methamphetamine, and, although the items purchased in both cases have both legal and illegal uses, an individual buying two items commonly found in a hardware store, coupled with no other suspicious behavior, distinguishes the facts here from those in *Vereb.*

Second, the driver in *Vereb* committed a traffic violation by speeding away from the police car at over 75 miles per hour. *Id.* at 345. *Vereb's* facts do not establish explicitly or suggest that the police had activated flashing red lights to initiate a stop, or in any other way seized the individuals before their vehicle fled at a high rate of speed. In this case, it was not until after Deputy Carlson activated his flashing lights that Bergerson fled. The quality and quantity of evidence in *Vereb* were sufficient to support the officer's reasonable, articulable suspicion. The same cannot be said about the evidence here.

██ The state argues that the stop was justified by Bergerson's choice to ignore Deputy Carlson's indications that he was attempting to pull Bergerson over. But each of these indications occurred after Deputy Carlson seized Bergerson by activating the squad car's flashing red lights. At the point of seizure, Carlson did not have reasonable, articulable suspicion to stop Bergerson. The seizure, therefore, was unconstitutional.

## II.

██ Bergerson next argues that the evidence found as a result of the stop should have been suppressed under the exclusionary rule. Evidence obtained through an illegal seizure is inadmissible to support a conviction. *State v. Harris,* 590 N.W.2d 90, 97 (Minn.1999). "[E]vidence discovered by exploiting previous illegal conduct is inadmissible." *State v. Olson,* 634 N.W.2d 224, 229 (Minn.App. 2001) (citing *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963)), *review denied* (Minn. Dec. 11, 2001). Such evidence is "fruit of the poisonous tree," and to be admissible, the state must prove that the evidence was obtained "by means sufficiently distinguishable to be purged of the primary taint." *Id.* (quoting *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417).

██ We examine several factors to determine whether evidence is fruit of the poisonous tree. *Knapp v. Comm'r of Pub. Safety,* 610 N.W.2d 625, 628 (Minn.2000). These factors include: (1) the purpose and flagrancy of the officer's misconduct, (2) the presence of intervening circumstances, (3) whether it is likely the evidence would have been obtained in the absence of the illegality, and (4) the temporal proximity of the illegality and the evidence alleged to be the fruit of the illegality. *State v. Warndahl,* 436 N.W.2d 770, 776 (Minn. 1989). No single factor is dispositive. *State v. Weekes,* 268 N.W.2d 705, 709 (Minn.1978). Rather, we must balance all of these factors. *Id.*

### A. The purpose and flagrancy of the misconduct

Although Deputy Carlson's conduct was not particularly flagrant, the stop he initi-

ated was unlawful, because reasonable suspicion did not support the stop. Deputy Carlson testified that he stopped Bergerson to identify him and discover his intentions. This is precisely the type of conduct the exclusionary rule is intended to prevent. *See State v. Hardy*, 577 N.W.2d 212, 217 (Minn.1998) (stating that "the primary purpose of the exclusionary rule is to deter police misconduct" by eliminating temptation for police officer to proceed with less than constitutional prerequisites for search and seizure). Our application of the facts to this factor weighs in favor of suppression.

### B. The presence of intervening circumstances

This factor requires us to determine whether the state has shown that Bergerson's actions were "intervening circumstances sufficient to purge the illegality of its primary taint." *State v. Ingram*, 570 N.W.2d 173, 178 (Minn.App.1997), *review denied* (Minn. Dec. 22, 1997). In applying this factor, we have distinguished between offering physical resistance to arrest and merely fleeing an officer to dispose of evidence. We addressed this distinction in *Ingram*, where, after officers received a tip that an individual was selling drugs in a bus shelter, they asked a person who walked away from the shelter if they could ask him some questions. *Id.* at 175. When the officer asked Ingram to put his hands on the wall for a pat search, he pushed the officer out of the way and fled. *Id.* We held that the pistol subsequently recovered from Ingram was properly admitted, because "Ingram was not permitted to brush Officer Gray out of the way and flee." *Id.* at 178. We then explained why physically resisting arrest is an intervening circumstance:

> A defendant may not resort to self-help to resolve disputes concerning unreasonable searches and seizures, because the

legal safeguards under the Fourth, Fifth, Sixth, and Fourteenth Amendments provide the victim of an unlawful search with realistic and orderly legal alternatives to physical resistance.

*Id.* at 178 (quotations and citations omitted).

Citing *Ingram*, the state argues that fleeing, without physical confrontation, is sufficient to purge the taint of illegal police conduct. We have rejected this interpretation of *Ingram*, however, and distinguished between two types of conduct that involve flight:

> *Ingram* also explains that resisting arrest is different from merely fleeing and attempting to dispose of incriminating evidence; disposing of contraband is a "predictable and common response" to an illegal search that warrants suppression of the evidence.

*Olson*, 634 N.W.2d at 230 (quoting *Ingram*, 570 N.W.2d at 178), *review denied* (Minn. Dec. 11, 2001). Unlike the suspect in *Ingram*, Bergerson did not resist arrest by pushing away an officer. He merely fled.

We conclude that Bergerson's flight was an abandonment of evidence. *See. e.g. State v. Dineen*, 296 N.W.2d 421, 422 (Minn.1980) (holding that contraband left in car when individual fled was properly suppressed because officer lacked probable cause to search). Bergerson's flight, without physical resistance, did not present an intervening circumstance sufficient to purge the taint of illegality. This factor weighs in favor of suppression.

### C. Likelihood of discovery without the illegality

Were it not for Deputy Carlson's seizure of Bergerson, it is unlikely that police would have discovered the methamphetamine in Bergerson's car. The record

does not establish that police would have encountered the evidence in any other way. Thus, this factor weighs in favor of suppression.

### D. Temporal proximity

"A close temporal proximity favors exclusion." *Olson,* 634 N.W.2d at 229 (holding that close temporal proximity existed where officer "discovered the methamphetamine within a short time after the initial arrest") (citation omitted). Although the officers did not execute the search warrant for Bergerson's car until the next day, upon Bergerson's arrest, they immediately seized another ingredient in the manufacture of methamphetamine, saw other suspicious items, and took custody of the car containing the evidence. This factor weighs in favor of suppression.

Balancing these four factors, we conclude that the discovery of the methamphetamine was the fruit of an illegal seizure. The chain of events leading to the discovery of the evidence was directly related to the stop, and Bergerson's conduct did not create an intervening event that would have otherwise led the police to discover the evidence.

The officers obtained the methamphetamine as the result of an illegal seizure, which makes the evidence inadmissible to support a conviction. *Harris,* 590 N.W.2d at 97. The evidence is "fruit of the poisonous tree," and Bergerson's actions after the seizure are not sufficient to purge the recovery of the methamphetamine from the taint of the illegal stop.

We are mindful that most investigatory stops occur when an officer has constitutional grounds to do so—namely, reasonable, articulable suspicion of criminal activity. Our ruling does not impede the use of this investigative tool, which is essential to effective law enforcement. We also are mindful of the important function served by observant citizens who assist police in ferreting out criminal activity. Our ruling does not diminish that important function. Simply put, the constitutional guaranties that our ruling is founded on require that police initiate stops only after their investigation has transformed the limited observations and hunches of citizens and police alike into "specific and articulable facts, which taken together with rational inferences from those facts," reasonably establish suspicion of criminal activity. *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880.

**Reversed.**