STATE of Minnesota, Respondent,

v.

Rosalyn McDONALD–RICHARDS,
Appellant.

No. A11–1449.

Supreme Court of Minnesota.

Jan. 23, 2013.

Lori Swanson, Attorney General, Saint Paul, MN; Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Rochelle P. Winn, Assistant State Public Defender, Saint Paul, MN, for appellant.

## OPINION

GILDEA, Chief Justice.

Appellant Rosalyn McDonald–Richards was convicted of one count of aiding and abetting first-degree murder, in violation of Minn.Stat. §§ 609.185(a)(3), 609.05 (2012), and one count of aiding and abetting attempted first-degree murder, in violation of Minn.Stat. §§ 609.185(a)(3), 609.05, 609.17 (2012). In this direct appeal, McDonald–Richards argues that her convictions must be reversed because of

the erroneous admission of a statement she made to police. We agree with McDonald–Richards that the statement was admitted in error. But, because we conclude that the error was harmless beyond a reasonable doubt, we affirm.

This case arises from a robbery and shooting that took place on the evening of September 28, 2009, at Avi's Pawn & Jewelry ("Avi's") in Richfield. The State presented evidence at trial that McDonald–Richards drove her boyfriend, Calvin Anderson, and Anderson's friend, Johnny Perry, to Avi's that evening. McDonald–Richards parked her car in a parking lot across the street from Avi's. Anderson and Perry exited the car; McDonald–Richards did not. Anderson and Perry proceeded to rob Avi's. During the course of the robbery, Perry fired a shot from a nine millimeter handgun in the direction of Malcolm Cowens, a customer shopping at Avi's, and an Avi's clerk, as Cowens and the clerk were attempting to flee through Avi's front door. The bullet from Perry's gun struck the clerk in the arm and Cowens in the back.

After Perry shot the clerk and Cowens, Anderson instructed a second Avi's employee to turn over the cash drawer and open the jewelry cases. Anderson took the cash drawer. Anderson and Perry then fled Avi's and ran across the street to McDonald–Richards' car. McDonald–Richards unlocked the doors of her car so that Anderson and Perry could get in, and then she drove away.

The victims of the shooting were transported by ambulance to Hennepin County Medical Center. The clerk was treated and released. But Cowens lost consciousness on the way to the hospital. He experienced significant blood loss and kidney damage, and was pronounced dead at 11:51 p.m. that night. The Assistant Hennepin County Medical Examiner performed an autopsy on Cowens, recovering a bullet that matched a nine millimeter handgun later recovered from Perry's residence. The medical examiner determined that the cause of death was a gunshot wound to the abdomen.

As part of the investigation into the robbery and shooting, Richfield police released to the local media images taken from surveillance cameras installed at Avi's. A member of the public contacted police after seeing the images and identified Anderson as one of the men involved in the crime. Police confirmed Anderson's identification with his probation officer. The probation officer also told police that Anderson lived in Fridley with his girlfriend, McDonald–Richards.

On September 29, 2009, one day after the robbery and shooting at Avi's, police observed McDonald–Richards leave her Fridley residence, drive to north Minneapolis, and pick up Anderson. Police followed McDonald–Richards and Anderson for a few blocks before stopping the car at gunpoint at approximately 2:30 p.m. The car was surrounded by six to ten police officers with drawn weapons and several marked and unmarked squad cars. McDonald–Richards was ordered out of the car at gunpoint, handcuffed, and placed in a police squad car for transportation to the Richfield police station. McDonald–Richards' car was towed to the Richfield police station pursuant to a search warrant.

After arriving at the police station with McDonald–Richards, police placed her in a locked holding cell. Approximately two hours later, McDonald–Richards was taken to an interview room where Detective Ogren interviewed her. Officer Peterson was also present. In response to a question from McDonald–Richards near the beginning of the interview, police told her that she was under arrest and not free to leave. When McDonald–Richards stated

that she had not been read her *Miranda* rights, Detective Ogren advised her of her *Miranda* rights.

Detective Ogren interviewed McDonald–Richards for approximately 40 minutes. McDonald–Richards said that she was not at Avi's on the evening of September 28, 2009. She told police that her car was missing that evening until Anderson returned home around 10:30 p.m. or 11:00 p.m. McDonald–Richards identified Anderson in the still images from Avi's robbery. When asked whether she could identify the man pictured in surveillance footage with Anderson, McDonald–Richards responded that she may have previously seen him, but that she did not know him. Finally, McDonald–Richards said that Anderson told her to tell anyone who asked that he had been fishing all day on the day of the robbery.

At no point during the interview did McDonald–Richards indicate her unwillingness to speak to officers or request to terminate the interview. McDonald–Richards also did not request an attorney at any point during the interview. McDonald–Richards affirmed that her statements were truthful, voluntary, and given of her own free will. Police released McDonald–Richards at approximately 6:20 p.m. on the same day that she was arrested.

Police also questioned Anderson. Based on information they received from Anderson, police arrested Perry at approximately 10:30 p.m. on September 29, 2009. Police questioned Perry, who admitted shooting the clerk and Cowens. Perry also stated that McDonald–Richards had been at Avi's the morning of the robbery and had observed a high-dollar transaction. Additionally, Perry claimed that McDonald–Richards helped plan the robbery, drew a diagram of the store's floor plan, encouraged Perry to participate, and saw both of the handguns that he and Anderson carried during the robbery. Perry stated that McDonald–Richards drove Anderson and him to Avi's, waited outside, and drove them away. Perry also claimed that McDonald–Richards heard him say that he may have shot someone. Finally, Perry told police that McDonald–Richards assisted Anderson and him in robbing Diamonds & Gold in Robbinsdale approximately two weeks before the Avi's robbery.

On October 1, 2009, McDonald–Richards called the Richfield Police Department to ask about her car and some jewelry in her possession. Police picked up McDonald–Richards and transported her to the police station, where she spoke with Detective Ogren and Officer Peterson. At the beginning of this interview, McDonald–Richards was again read her *Miranda* rights and indicated she understood them. Initially, McDonald–Richards affirmed the statements she made in the first interview. She also admitted for the first time that she had visited Avi's on the morning of the robbery to pawn a ring. McDonald–Richards said that Anderson was not with her when she visited Avi's that morning. McDonald–Richards also told police she suspected the jewelry Anderson had recently given her came from the robbery of a jewelry store in Robbinsdale that she had heard about on the news two weeks earlier. Aside from what she heard about the robbery on the news, McDonald–Richards denied knowledge of the robbery in Robbinsdale and stated she was not with Anderson when it occurred.

Based on information obtained from Perry, police questioned McDonald–Richards more aggressively in the second interview. McDonald–Richards initially denied all involvement but then revealed that she drove Anderson and Perry to and from Avi's on the evening of September 28,

knew Perry by the nickname "O," and observed Anderson and Perry running back to the car from Avi's with items stuffed under their jackets. McDonald–Richards denied Perry's allegations that she had drawn a diagram of Avi's floor plan, encouraged Perry to participate in the robbery, or heard Anderson and Perry discuss shooting someone. McDonald–Richards also told police that she lied during the first interview because she was afraid.

Following the investigation, McDonald–Richards was indicted on one count of aiding and abetting the first-degree murder of Cowens in violation of Minn.Stat. §§ 609.185(a)(3), 609.05, and one count of aiding and abetting the attempted first-degree murder of the clerk in violation of Minn.Stat. §§ 609.185(a)(3), 609.05, 609.17. Before trial, McDonald–Richards moved to suppress her statements to police on September 29, 2009 ("first statement") and October 1, 2009 ("second statement") on the ground the statements were the fruit of her unlawful arrest during the September 29 traffic stop.[1] The district court denied McDonald–Richards' motion. The State introduced both of McDonald–Richards' statements to police during its case-in-chief and played the recording of each statement for the jury.

At trial, McDonald–Richards did not contest the State's presentation of evidence concerning the events at Avi's on the evening of September 28, 2009. Further, McDonald–Richards did not dispute that by driving Anderson and Perry to and from the robbery, she physically assisted them. The only disputed issue at trial was whether McDonald–Richards knowingly and intentionally assisted Anderson and Perry in committing the murder of Cowens and the attempted murder of the clerk.

McDonald–Richards testified on her own behalf. She explained that although Anderson had been with her when she visited Avi's on the morning of the robbery, she did not know Anderson and Perry were planning to rob Avi's. McDonald–Richards said that she had not provided Anderson and Perry with any detailed information about Avi's, and that she did not know they had robbed Avi's when she was driving them away from the pawnshop. McDonald–Richards admitted that she had lied to police in her first statement and explained that she did so because she was afraid. The State used McDonald–Richards' statements to impeach her credibility during its cross examination of her. Finally, to support McDonald–Richards' claims that Anderson was abusive, McDonald–Richards offered testimony from her siblings and a friend, and these witnesses also testified as to their efforts to help McDonald–Richards move out of the apartment she shared with Anderson.

Following the presentation of evidence, the jury returned a guilty verdict on both charges. The district court convicted McDonald–Richards of both offenses, imposed a life sentence for the offense of aiding and abetting first-degree murder and 180 months for the offense of aiding and abetting attempted first-degree murder, and ruled that the sentences shall run concurrently. This direct appeal follows.

## I.

On appeal, McDonald–Richards challenges the admission of the first statement she made to police. McDonald–Richards argues that her first statement should have been excluded because the unlawful

---

1. In this appeal McDonald–Richards challenges only the denial of her motion to suppress her first statement.

arrest tainted the statement and violated her Fourth Amendment rights. The State counters that even though McDonald–Richards' arrest was unlawful, the district court properly admitted the first statement. When the question is whether the Fourth Amendment has been violated, we review "[t]he district court's factual findings ... under the clearly erroneous standard, but we review the district court's legal determinations de novo." *State v. Bourke*, 718 N.W.2d 922, 927 (Minn.2006); *see also State v. Diede*, 795 N.W.2d 836, 843 (Minn.2011); *State v. Hardy*, 577 N.W.2d 212, 215 (Minn.1998).

### A.

■ The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When evidence is obtained in violation of the Fourth Amendment, "[t]he exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In addition to physical evidence, "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest ... is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." [2] *Id.*

But, as the United States Supreme Court recognized in *Brown v. Illinois*, "[i]t is entirely possible ... that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality." 422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The

question presented in *Brown* was whether the giving of a *Miranda* warning was sufficient, by itself, to remove the taint of an arrest made in violation of the Fourth Amendment so that a statement taken as a product of that arrest was admissible. *Id.* at 591–92, 95 S.Ct. 2254. The Court held that the giving of a *Miranda* warning was relevant but that the warning standing alone was not sufficient to purge the taint of an illegal arrest. *Id.* at 603–04, 95 S.Ct. 2254. The Court determined that "[n]o single fact is dispositive," and that each case must be decided on its own facts. *Id.* at 603, 95 S.Ct. 2254. The Court listed several factors that are relevant to the question of whether the taint of an illegal arrest is sufficiently attenuated, including whether the police provided a *Miranda* warning, the time between arrest and confession, "the presence of intervening circumstances," and "particularly, the purpose and flagrancy of the official misconduct." *Id.* at 603–04, 95 S.Ct. 2254.

We adopted the *Brown* fact-specific inquiry in *State v. Weekes (Weekes I)*, 312 Minn. 1, 7–8, 250 N.W.2d 590, 594 (1977). In that case, defendant Weekes voluntarily appeared in connection with the police investigation of the death of Weekes' girlfriend's son. Weekes denied striking the child, and the police, "[f]or reasons which [were] not clear from the record," held Weekes in a locked jail cell for 34 hours. *Id.* at 5, 250 N.W.2d at 592. The police then questioned him again, and Weekes admitted that he had struck the child with sufficient force to cause the child to fall down the stairs head first. *Id.* at 5, 250 N.W.2d at 593.

At trial, Weekes' statements were admitted against him, and he was found

---

**2.** There is no dispute in this case that McDonald–Richards was under arrest when she made the statement at issue, and that the police arrested her in violation of her Fourth Amendment rights.

guilty of first-degree manslaughter. *Id.* at 2, 250 N.W.2d at 591. On appeal, we determined that the factual record was insufficient for us to determine whether Weekes' statements should have been admitted. *Id.* at 10, 250 N.W.2d at 595. After adopting the standard from *Brown*, we remanded the question to the district court. We said that the statement's admissibility was "to be determined by whether [it] is 'sufficiently an act of free will to purge the primary taint of the unlawful invasion' in light of the policies served by the Fourth Amendment exclusionary rule." *Id.* at 7, 250 N.W.2d at 594 (quoting *Wong Sun*, 371 U.S. at 486, 83 S.Ct. 407).

On remand, the district court once again ruled the statement admissible, and the case came again to our court on appeal. *State v. Weekes (Weekes II)*, 268 N.W.2d 705, 706 (Minn.1978). In *Weekes II*, we reiterated that several factors were relevant "to determine whether the taint of an illegal arrest can be purged," but that "[n]o one factor provides a certain guide." *Id.* at 708–09. We listed the following factors:

> (1) Whether *Miranda* warnings were given; (2) The temporal proximity of the arrest and the confession; (3) The presence of any intervening circumstances; (4) The purpose and flagrancy of the official misconduct; (5) The treatment of defendant while confined; (6) His relationship with his interrogators; and (7) His freedom of communication with persons other than law-enforcement officers.

*Id.* at 708–09. The question to be answered through the fact-specific analysis was whether the statement was "given independently of the primary illegality, such that the connection between the illegal arrest and the confession is sufficiently tenuous so as to purge that taint." *Id.* at 709.

Reviewing the district court's determination de novo, we concluded that the State had not met its burden to prove that Weekes' statement was admissible. *Id.* at 709–11. We reach the same conclusion in this case.

■ Applying the *Weekes* factors, the district court concluded, among other things, that McDonald–Richards' statement was admissible because police gave her a *Miranda* warning, she was held for "a relatively short" period, the "flagrancy of the violation" was "lessened[ ] because there was a reason" for police to stop McDonald–Richards' car, and police treated her well and were not "confrontational." The court held that these factors "relieve[d] any taint" from the fact that McDonald–Richards was "improperly held in arrest custody." We disagree.

■ The district court improperly admitted McDonald–Richards' statement because the court did not consider the statement's admissibility "in light of the policies served by the Fourth Amendment exclusionary rule." *Weekes I*, 312 Minn. at 7, 250 N.W.2d at 594. One of the purposes the exclusionary rule serves is to deter police violations of the Fourth Amendment. *Brown*, 422 U.S. at 599, 95 S.Ct. 2254. There is no dispute in this case that McDonald–Richards' Fourth Amendment rights were violated when the police seized her without probable cause. Indeed, police witnesses at the pre-trial suppression hearing conceded that they had no information regarding McDonald–Richards' participation in the robbery and murder at Avi's and considered her merely a person of interest when they arrested her. Based on the information known to the arresting officers at the time of McDonald–Richards' arrest, there was no objective basis for a reasonable officer to conclude there was

probable cause for her arrest.[3] *See State v. Munson*, 594 N.W.2d 128, 136 (Minn. 1999) (noting that probable cause is measured objectively). When police arrest someone without probable cause and fail to articulate any other lawful basis for their conduct, the police violation of the Fourth Amendment is flagrant. *See Weekes II*, 268 N.W.2d at 710 (noting that "[t]he most important factor in the determination that the confession was illegally obtained was the flagrant nature of the police action."); *see also Weekes I*, 312 Minn. at 7, 250 N.W.2d at 594 (noting that police action is considered flagrant when it is "clear that [the] defendant was taken into custody and confined without a warrant and without probable cause" because "absent probable cause there is not and never has been any lawful basis for holding a person for investigation or on suspicion.") (citation omitted) (internal quotation marks omitted). Such unlawful seizures will not be deterred if, as the district court held, the giving of a *Miranda* warning, two hours of confinement, and a non-confrontational police interrogation are sufficient to purge the taint from the constitutional violation.

▆▆ With respect to *Miranda* warnings, such warnings are "an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest." *Brown*, 422 U.S. at 603, 95 S.Ct. 2254. But *Miranda* warnings by themselves are not sufficient to purge the taint of a Fourth Amendment violation because the voluntariness of a statement under the Fifth Amendment does not remove the causal connection between the statement and a Fourth Amendment violation. *Dunaway v. New York*, 442 U.S. 200, 217–18, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). As the Supreme Court held in *Brown*, something more than a *Miranda* warning is required to support the admission of a statement taken as part of an arrest made in violation of the Fourth Amendment. *See Brown*, 422 U.S. at 602, 95 S.Ct. 2254 ("If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted.").

▆ The district court also relied on the fact that approximately two hours elapsed between McDonald–Richards' arrest and the commencement of interrogation. But this period of confinement does not operate to purge the taint of Mc-Donald–Richards' arrest. Our precedent and the precedent of the United States Supreme Court require an intervening event that operates to remove the taint of an illegal arrest. When the defendant is held continuously in police custody without the assistance of counsel—for a few hours or for many hours—there is no intervening event that operates to remove the causal connection between the statement and the illegal arrest. *See Taylor v. Alabama*, 457 U.S. 687, 691, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982) (suppressing statement given six hours after defendant was illegally seized); *Brown*, 422 U.S. at 604–05, 95 S.Ct. 2254 (suppressing statement made less than two hours after illegal arrest); *State v. Olson*, 436 N.W.2d 92, 98 (Minn. 1989) (suppressing a statement made within an hour of the illegal arrest).

▆ The district court also erroneously applied the Fifth Amendment voluntariness standard to the Fourth Amendment violation presented here.

---

**3.** The State does not argue, nor do we decide, whether McDonald–Richards could have been lawfully held as a material witness under Minn.Stat. §§ 629.54–629.55 (2012) and *State ex rel. Howard v. Grace*, 18 Minn. 398 (Gil 359), 1872 WL 3316 (1872).

*See Dunaway*, 442 U.S. at 219, 99 S.Ct. 2248 (discussing "lingering confusion between 'voluntariness' for purposes of the Fifth Amendment and the 'causal connection' test established in *Brown* "). Although "the Fifth Amendment is in 'intimate relation' with the Fourth," whether a confession is voluntary under the Fifth Amendment is a distinct inquiry from whether a confession is the product of an illegal search or seizure under the Fourth Amendment. *Brown*, 422 U.S. at 601, 95 S.Ct. 2254 (quoting *Boyd v. United States*, 116 U.S. 616, 633, 6 S.Ct. 524, 29 L.Ed. 746 (1886)). In a Fifth Amendment voluntariness inquiry, the brevity of defendant's encounter with police may suggest that a confession was voluntary and favor admission of the statement. *See State v. Wilson*, 535 N.W.2d 597, 603–04 (Minn.1995) (concluding that a confession was voluntary when defendant was questioned for approximately an hour and a half); *State v. Jungbauer*, 348 N.W.2d 344, 346–47 (Minn.1984) (concluding that a confession was voluntary when the defendant was not subject to prolonged interrogation). But in the context of a Fourth Amendment violation, " 'voluntariness' is merely a 'threshold requirement.' " *Dunaway*, 442 U.S. at 217, 99 S.Ct. 2248 (quoting *Brown*, 422 U.S. at 604, 95 S.Ct. 2254). Our ruling in *Olson* and the Supreme Court's holdings in *Taylor* and *Dunaway* indicate that continuous confinement between an arrest and statement does not purge the taint of an unlawful arrest for purposes of the Fourth Amendment. Here, there was effectively no break in causation between the Fourth Amendment violation and McDonald–Richards' statement because the statement was made while she was unlawfully detained. The district court therefore incorrectly determined that the two to three hours that McDonald–Richards was confined after her unlawful arrest favored admission of the statement.[4]

▮▮▮ The district court likewise erred in determining that intervening circumstances purged the taint of McDonald–Richards' arrest. Courts have previously held that sufficient intervening events include the defendant's represented appearance before a magistrate, *Johnson v. Louisiana*, 406 U.S. 356, 365, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972); release from custody, *In re Welfare of M.D.S.*, 345 N.W.2d 723, 731 (Minn.1984) (citing *Wong Sun*, 371 U.S. at 491, 83 S.Ct. 407); consultation with and represented by counsel, *Carnejo–Molina v. INS*, 649 F.2d 1145, 1149 (5th Cir.1981); and brandishing of a gun toward the arresting officer, *State v. Bale*, 267 N.W.2d 730, 731–33 (Minn.1978). In contrast to these cases, no intervening event occurred between McDonald–Richards' arrest and interrogation. She was arrested, held in custody, and then interviewed. Neither of the events found by the district court—McDonald-Richards' presence with Anderson and the legality of her brief initial detention during the stop—are intervening events because they occurred prior to McDonald–Richards' ille-

---

4. The district court found that McDonald–Richards was held in a cell and had no freedom of communication with persons other than police officers. The State argues on appeal that there is no evidence McDonald–Richards wanted to communicate with others during her detention or that anyone sought to communicate with her. But the record contains no evidence that McDonald–Richards had the means to communicate with anyone other than the police while she was in custody. The record therefore supports the district court's finding and it is not clearly erroneous. The district court's conclusion that this factor favors McDonald–Richards is also correct and further supports our conclusion in this case that McDonald–Richards' statement to police was sufficiently tainted by her illegal arrest to render the statement inadmissible.

gal arrest and detention and her first statement to police. Preceding events, including the two events cited by the district court, cannot intervene to break the causal chain between an illegal arrest and a statement. The district court therefore erred in determining that the intervening-circumstances factor favored admission of the statement.

 The district court also found that police were non-confrontational with McDonald–Richards, and treated her neutrally as a witness during the first interview. Both parties agree that McDonald–Richards' relationship with police was neutral. Our review of the transcript and audio recording of McDonald–Richards' interrogation indicates that the police officers interviewing McDonald–Richards were polite in their questioning and sympathetic when McDonald–Richards described how Anderson had abused her. McDonald–Richards expressed anger toward the officers at the outset of the interview, but she generally appeared cooperative. But this analysis again relates to the voluntariness of McDonald–Richards' statement and these circumstances are not sufficient to purge the taint of her illegal arrest in this case.

After considering all of the *Weekes* factors and "in light of the policies served by the Fourth Amendment exclusionary rule," we conclude that the taint of McDonald–Richards' unlawful arrest was not purged and her September 29 statement was therefore inadmissible. *Weekes I*, 312 Minn. at 7, 250 N.W.2d at 594. We therefore hold that the district court erred in admitting McDonald–Richards' September 29 statement into evidence at trial.

B.

 Having concluded that McDonald–Richards' statement was erroneously admitted, we turn next to the question of whether the error was harmless. To determine whether a constitutional error regarding the admission of evidence is harmless, we consider "the manner in which the evidence was presented, whether it was highly persuasive, whether it was used in closing argument, and whether it was effectively countered by the defendant." *State v. Al–Naseer*, 690 N.W.2d 744, 748 (Minn.2005); *see also State v. Caulfield*, 722 N.W.2d 304, 314–16 (Minn. 2006) (applying the *Al–Naseer* factors). Overwhelming evidence of guilt is also an important consideration, "[b]ut the court cannot focus on the evidence of guilt alone." *Al–Naseer*, 690 N.W.2d at 748. When the outcome of the trial turns on the respective credibility of the defendant and another witness, evidence affecting "who the jury found more credible" may influence the outcome of the case. *Van Buren v. State*, 556 N.W.2d 548, 551 (Minn.1996).

 Improperly admitted evidence is harmless, however, when the evidence is cumulative or there is "other extensive evidence connecting [the defendant] to the commission of the crime." *State v. Larson*, 788 N.W.2d 25, 33 (Minn.2010) (concluding that the erroneous admission of evidence was harmless error when the State presented witness testimony and forensic evidence corroborated the testimony linking the defendant to the crime); *see also State v. Tscheu*, 758 N.W.2d 849, 865 (Minn.2009) (finding that erroneous admission of hearsay evidence in violation of the Confrontation Clause was harmless error when the hearsay was cumulative of other admissible testimony).

McDonald–Richards contends that under the *Al–Naseer* factors, the admission of her statement was not harmless. We disagree.

The first factor examines the manner in which the erroneously admitted evidence

was presented. Here, the audio recordings of McDonald–Richards' first and second statements were played for the jury during the State's case-in-chief, police witnesses were asked about her statements, and the State cross-examined McDonald–Richards on the basis of her statements to the police.

In terms of the persuasiveness of the erroneously admitted evidence, the State used the first statement for impeachment purposes. But the statement was cumulative of other impeachment evidence and therefore not persuasive for purposes of the *Al–Naseer* factors. This is so because the lies McDonald–Richards told in her first statement were repeated in her second statement. Moreover, McDonald–Richards' trial testimony was inconsistent with her second statement, and her trial testimony therefore provided yet one more basis upon which the jury could find her testimony not credible.

With respect to closing arguments, the State generally referenced McDonald–Richards' tendency to lie in the context of both of her statements to police. The State did not focus only on the first statement as a demonstration of McDonald–Richards' lack of truthfulness.[5]

Finally, McDonald–Richards had notice that the State intended to introduce both of her statements and the opportunity to counter this evidence. McDonald–Richards explained during her testimony that she lied to police because she was afraid. And McDonald–Richards' counsel supported her explanation in closing argument.

In sum, McDonald–Richards' first statement to police was offered only as impeachment evidence. The statement was not particularly persuasive evidence with respect to McDonald–Richards' credibility because it was cumulative of other overwhelming evidence of her lack of truthfulness. Indeed, McDonald–Richards told police the same lies in her second, unchallenged statement as she did in her first statement. McDonald–Richards also had the opportunity to counter the evidence provided in her first statement.

Our review of the record convinces us that the guilty verdict was surely unattributable to the erroneous admission at trial of McDonald–Richards' first statement to police. We therefore hold that the error in admitting this statement was harmless beyond a reasonable doubt.

Affirmed.

WRIGHT, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

---

5. McDonald–Richards argues the State made specific reference to her first statement in closing argument. The State argued that McDonald–Richards was "a pretty darn good liar" because she was able to dupe two seasoned investigators, as evidenced by the police officers thanking McDonald–Richards for her honesty at the conclusion of her first statement. But, when the State's assertion is considered with all of the lies and inconsistencies in McDonald–Richards' second statement and trial testimony, the State's argument does not alter our conclusion that the jury's verdict was surely unattributable to the erroneous admission of McDonald–Richards' first statement.