*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1911**

State of Minnesota,
Respondent,

vs.

Barry Lee Jacobson,
Appellant.

**Filed October 5, 2015
Affirmed
Larkin, Judge**

Beltrami County District Court
File No. 04-CR-13-3778

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Annie Pat Claesson-Huseby, Beltrami County Attorney, David P. Frank, Assistant County Attorney, Bemidji, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Andrea Gabrielle M. Barts, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Larkin, Judge; and Chutich, Judge.

**UNPUBLISHED OPINION**

**LARKIN**, Judge

Appellant challenges his convictions of first-degree sale of a controlled substance and possession of a firearm as an ineligible person, arguing that the police failed to comply with the Fourth Amendment's knock-and-announce requirement when executing a search warrant at his property and that his confession during the search was involuntary. We affirm.

## FACTS

Officers with the Paul Bunyan Drug Task Force (PBDTF) and Minnesota Bureau of Criminal Apprehension (BCA) obtained a search warrant for all buildings, vehicles, and premises on appellant Barry Lee Jacobson's property.[1] The officers obtained the warrant based on information indicating that Jacobson had supplied methamphetamine that was purchased by a confidential reliable informant during a controlled buy earlier that day. The warrant authorized a nighttime search for methamphetamine, controlled substances, money, evidence of drug dealing, and firearms.

Fifteen officers from the PBDTF, BCA, Beltrami County Sheriff's Office, and Pine to Prairie Drug Task Force executed the warrant. The officers traveled to Jacobson's residence in eight vehicles, pulled into the driveway, and activated the emergency lights on their vehicles to alert the residents of their presence.

---

[1] Our statement of facts is based on factual findings made by the district court following a contested evidentiary hearing on Jacobson's motion to suppress.

Beltrami County Deputy Rob Fraik was one of the first officers to arrive. He observed an individual standing near a partially open door outside a detached garage. As Deputy Fraik approached, the individual yelled to someone inside the garage. Deputy Fraik shouted: "[P]olice, search warrant, hands up!" Deputy Fraik approached the open door and again announced his presence, yelling: "[P]olice, search warrant!" Deputy Fraik pushed the door further open and saw Jacobson inside the garage. Deputy Fraik removed Jacobson from the garage.

As Deputy Fraik was approaching the garage, Beltrami County Sergeant Jason Riggs approached the house. As Sergeant Riggs approached, he looked through a window and made eye contact with an elderly woman inside. The woman approached the door, and Sergeant Riggs shouted: "[P]olice, search warrant!" As the woman was about to open the door, Sergeant Riggs opened it and again stated that law enforcement was present to execute a search warrant. Officers searched the property, finding methamphetamine, money, other evidence of drug trafficking, and firearms.

While other officers searched the property, Special Agent Chad Museus, Special Agent Don Newhouse, and Deputy Fraik interviewed Jacobson in an unfinished room toward the back of the house. Jacobson acknowledged that there were firearms on his property, as well as a small amount of methamphetamine, but he denied dealing methamphetamine. After the officers questioned Jacobson about federal buy-fund money that was found in his wallet, Jacobson confessed to selling methamphetamine earlier that day. Agents Museus and Newhouse told Jacobson that they wanted him to identify his supplier and cooperate with an investigation regarding the supplier. The agents told

3

Jacobson that although they could not make any promises, he would receive "consideration" on his criminal charges if he cooperated. Jacobson told the agents that he would be safer in prison than cooperating with law enforcement and declined to work with them.

Respondent State of Minnesota charged Jacobson with first-degree sale of a controlled substance and possession of a firearm as an ineligible person. Jacobson moved to suppress the evidence from the search and his confession, arguing that the police failed to comply with the knock-and-announce requirement when executing the warrant and that his confession was not voluntary. The district court denied the motion after an evidentiary hearing. Jacobson stipulated to the state's case under Minnesota Rule of Criminal Procedure 26.01, subdivision 4, to obtain appellate review of the district court's order denying his motion to suppress. The district court found Jacobson guilty of both charges and sentenced him to serve an executed prison term. Jacobson appeals.

## DECISION

## I.

Jacobson contends that the officers violated the Fourth Amendment's knock-and-announce requirement and that the evidence from the search therefore should have been suppressed. When determining whether the Fourth Amendment has been violated, an appellate court reviews the district court's factual findings for clear error and the district court's legal determinations de novo. *State v. McDonald-Richards*, 840 N.W.2d 9, 15 (Minn. 2013); *see also State v. Hardy*, 577 N.W.2d 212, 215 (Minn. 1998) ("When reviewing a challenge under the Fourth Amendment of the United States Constitution on

4

undisputed facts, the reviewing court may independently analyze the facts to determine whether evidence needs to be suppressed as a matter of law.").

The Fourth Amendment to the United States Constitution and Article I of the Minnesota Constitution prohibit the unreasonable search and seizure of "persons, houses, papers, and effects." U.S. Const. amend. IV; Minn. Const. art. I, § 10. Under early common law, courts adopted a "knock and announce" requirement applicable to the execution of search warrants. *Wilson v. Arkansas*, 514 U.S. 927, 931-33, 115 S. Ct. 1914, 1916-17 (1995). The purpose of the knock-and-announce requirement under common law primarily was to prevent property damage; the common law required that occupants be given an opportunity to comply with a search warrant and to allow the executing officers to enter without breaking down their door. *Id*. at 931-32, 115 S. Ct. at 1916-17. The common law recognized that forcible entry without an announcement would penalize someone who "'did not know of the process, of which, if he had notice, [presumably] would [have] obey[ed] it.'" *Hudson v. Michigan*, 547 U.S. 586, 594, 126 S. Ct. 2159, 2165 (2006) (quoting *Wilson*, 514 U.S. at 931-32, 115 S. Ct. 1916-17). "[T]he common-law knock and announce principle forms a part of the Fourth Amendment reasonableness inquiry." *Wilson*, 514 U.S. at 930, 934, 115 S. Ct. at 1916, 1918.

Jacobson notes that "[t]here are four components to the knock-and-announce requirement: (1) knock; (2) identification as law enforcement officer; (3) express the purpose of the officer's presence and the authority for the search or seizure; and (4) wait a reasonable time for the occupant to allow or refuse entry." *See Garza v. State*, 619 N.W.2d 573, 576 (Minn. App. 2000) (describing the four components of the knock-and-

5

announce rule), *aff'd in part, rev'd in part*, 632 N.W.2d 633, 639 (Minn. 2001). Jacobson argues that even if the police in this case adequately announced their presence and purpose, they did not knock or wait a reasonable time before entering. Jacobson therefore concludes that because the officers "wholly ignored a necessary component of the knock-and-announce rule," they did not satisfy the rule.

We question whether Jacobson's formulaic approach to the knock-and-announce requirement is appropriate. Although this court has described the knock-and-announce rule as having four components, *see id.*, we are not aware of any precedent requiring strict compliance with every component. In fact, the Supreme Court's knock-and-announce jurisprudence is inconsistent with Jacobson's approach. In *Wilson*, the Supreme Court noted that "'[n]o precise form of words is required in a case of this kind. It is sufficient that the party [whose home is to be searched] hath notice, that the officer cometh not as a mere trespasser, but claiming to act under a proper authority.'" 514 U.S. at 932, 115 S. Ct. at 1917 (quoting *Case of Richard Curtis* (1757) 168 Eng. Rep. 67, 68; Fost. 135, 137). The Supreme Court stated that "[t]he Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests." *Id.* at 934, 115 S. Ct. at 1918.

Later, in *United States v. Ramirez*, another case involving a "no-knock" entry, the Supreme Court stated, "The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant." 523 U.S. 65, 71, 118 S. Ct. 992, 996 (1998) (citation omitted). And in *United States v. Banks*, where the

6

Supreme Court considered "how to go about applying the standard of reasonableness to the length of time police with a warrant must wait before entering without permission after knocking and announcing," the Court stated:

> The Fourth Amendment says nothing specific about formalities in exercising a warrant's authorization, speaking to the manner of searching as well as to the legitimacy of searching at all simply in terms of the right to be "secure . . . against unreasonable searches and seizures." Although the notion of reasonable execution must therefore be fleshed out, we have done that case by case, largely avoiding categories and protocols for searches. Instead, we have treated reasonableness as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case; it is too hard to invent categories without giving short shrift to details that turn out to be important in a given instance, and without inflating marginal ones.

540 U.S. 31, 35-36, 124 S. Ct. 521, 524-25 (2003). The Supreme Court also stated that it "disapprove[d] of the [Ninth Circuit] Court of Appeals's four-part scheme for vetting knock-and-announce entries" and that "the Court of Appeals's overlay of a categorical scheme on the general reasonableness analysis threatens to distort the 'totality of the circumstances' principle, by replacing a stress on revealing facts with resort to pigeonholes." *Id.* at 41-42, 124 S. Ct. at 528. As the Supreme Court acknowledged in *Hudson*, "[w]hen the knock-and-announce rule does apply, it is not easy to determine precisely what officers must do." 547 U.S. at 590, 126 S. Ct. at 2163.

Based on the Supreme Court's knock-and-announce jurisprudence, we reject Jacobson's argument that an officer's failure to comply with one supposed component of the knock-and-announce rule automatically renders a search unreasonable. Instead, the

7

Fourth Amendment's flexible requirement of reasonableness and the totality of the circumstances establish the duty of an officer executing a search warrant on a case-by-case basis.

In assessing the reasonableness of the execution of the warrant in this case, we are guided by the Minnesota Supreme Court's approach in *State v. Prudhomme*, 287 N.W.2d 386, 388 (Minn. 1979). In that case, officers executing a search warrant at the defendant's residence knocked at the front and rear doors without getting any response, opened an unlocked rear door without announcing their authority or purpose, and entered what was described as a foyer of what appeared to be a duplex. *Prudhomme*, 287 N.W.2d at 388-89. The supreme court stated that

> it is useful to analyze this case in terms of the purposes served by the notice requirement. These purposes include, (a) preventing the unnecessary destruction of the property of the person whose dwelling is entered, (b) protecting innocent people by minimizing the chances of entry of the wrong premises by mistake, (c) protecting people against unnecessary shock or embarrassment connected with unannounced entries, and (d) decreasing the potential for a violent response by the occupant which might not otherwise occur if the occupant knows that the people seeking entry are police who have a warrant.

*Id*. at 389. The supreme court held that the officers' failure to announce their presence and purpose did not violate the Fourth Amendment, reasoning that "the action of the police did not seriously offend any of the purposes served by the [knock-and-announce] requirement."[2] *Id*.

_____

[2] The supreme court also noted that the defendant had a reduced expectation of privacy in the area entered. *Prudhomme*, 287 N.W.2d at 389.

Consistent with the Minnesota Supreme Court's approach in *Prudhomme*, we evaluate the alleged knock-and-announce violation in this case in the context of the interests served by the knock-and-announce requirement. The police entry did not cause any property damage. Indeed, there was no need for forced entry because both the garage and house doors were unlocked and the officers made contact with individuals on the premises before entering. Mistaken entry into the wrong premises is not an issue here because the police entered and searched the property described in the warrant. As to protecting against unnecessary shock and embarrassment, there are no findings suggesting that the occupants of the garage or the house were undressed or otherwise embarrassed by the entry. *See Hudson*, 547 U.S. at 594, 126 S. Ct. at 2165 (stating that "the knock-and-announce rule protects those elements of privacy and dignity that can be destroyed by a sudden entrance" by providing the opportunity "to pull on clothes or get out of bed . . . to collect oneself before answering the door" (quotation omitted)). Lastly, the officers decreased the potential for a violent response by announcing their identity and purpose. As a result, there was no reason for the occupants to believe they faced an unauthorized intrusion and respond violently in self-defense. *See id.* (stating that "an unannounced entry may provoke violence in supposed self-defense by the surprised resident").

Jacobson's main argument is that neither Deputy Fraik nor Sergeant Riggs actually knocked before entering the garage or the house. The purpose of knocking is to alert the occupants of police presence. As to that purpose, the district court found that the person standing outside the garage saw the police arrive and yelled to someone inside the

9

garage through an open door. The district court further found that Deputy Fraik twice announced the presence of the police: once as he approached the garage and a second time at the ajar garage door.[3] The district court also found that Sergeant Riggs made eye contact with an occupant of the house as he approached the front door and announced his presence. In sum, the record indicates that the occupants of the garage and home were aware of the presence of the police before the police entered, even though the police did not knock before entering.

Jacobson does not explain how the officers' failure to knock when the occupants were already aware of the presence of the police compromised the purpose of the knock-and-announce requirement. On this point, the decision in *Woodward v. Commonwealth*, 432 S.E.2d 510 (Va. Ct. App. 1993), is persuasive. In *Woodward*, officers "encountered an occupant of the home in the yard outside of the house" and "told her that they had a warrant to search the house[,] and she escorted them to the back door through which they entered." 432 S.E.2d at 513. The Virginia Court of Appeals concluded that "[t]he purpose of the 'knock and announce' rule was satisfied by their actions, even though they did not knock on the door before entering the home." *Id*. We reach the same conclusion here.

---

[3] Jacobson refers to an audio-visual recording from one of the officer's vehicles and asserts that "[t]he video, however, does not contain Fraik's first announcement and contradicts the conclusion that Fraik shouted 'Police search warrant' before he entered the garage." But Jacobson does not argue that the district court's finding that Deputy Fraik twice announced his presence is clearly erroneous. *See McDonald-Richards*, 840 N.W.2d at 15 (stating that an appellate court reviews the district court's factual findings for clear error). We therefore rely on the district court's finding.

Jacobson also argues that the officers violated the knock-and-announce requirement by failing to wait a reasonable period before entering. The Supreme Court discussed the reasonable waiting period in *Hudson*, explaining that it protects

> those elements of privacy and dignity that can be destroyed by a sudden entrance. It gives residents the opportunity to prepare themselves for the entry of the police. The brief interlude between announcement and entry with a warrant may be the opportunity that an individual has to pull on clothes or get out of bed. In other words, it assures the opportunity to collect oneself before answering the door.

547 U.S. at 594, 126 S. Ct. at 2165 (citations and quotations omitted). Here, the record does not suggest that the occupants of the garage and house were not presentable when the police entered. Thus, the action of the police did not have any "greater potential for causing unnecessary shock or embarrassment than an ordinary execution of a warrant." *Prudhomme*, 287 N.W.2d at 389.

Jacobson complains that the officers did not wait "a reasonable time to allow any occupant to allow them to enter." But it was not necessary for the occupants to expressly grant the officers permission to enter; the search warrant authorized their entry to search. *Cf. Hudson*, 547 U.S. 593, 126 S. Ct. at 2165 ("Until a valid warrant has issued, citizens are entitled to shield 'their persons, houses, papers, and effects,' U.S. Const., Amdt. 4, from the government's scrutiny."). The knock-and-announce requirement merely provides "the opportunity to comply with the law and to avoid the destruction of property occasioned by a forcible entry." *Id*.

11

Once again, the purpose of the knock-and-announce requirement at common law primarily was to prevent property damage. *Wilson*, 514 U.S. at 931, 931-33, 115 S. Ct. at 1916-17. In *Banks*, the Supreme Court discussed the reasonable waiting period in that context explaining:

> One point in making an officer knock and announce, then, is to give a person inside the chance to save his door. That is why, in the case with no reason to suspect an immediate risk of frustration or futility in waiting at all, the reasonable wait time may well be longer when police make a forced entry, since they ought to be more certain the occupant has had time to answer the door. . . Suffice it to say that the need to damage property in the course of getting in is a good reason to require more patience than it would be reasonable to expect *if the door were open*.

*Banks*, 540 U. S. at 41, 124 S. Ct. at 528 (emphasis added).

In this case, the doors were open. Moreover, before the officers entered Jacobson's garage and house, they made contact with individuals on the premises and announced that they were law enforcement officers who were present to execute a search warrant. There is no indication that the individuals with whom the officers made contact were undressed or in bed. In addition, because the doors were open and the occupants cooperated with the entry, forced entry was unnecessary and the entry did not damage Jacobson's property. Jacobson does not explain—and we do not discern—how a delay between announcement and entry would have served the purposes of the knock-and-announce requirement under these circumstances.[4] Under the totality of the

---

[4] We note that "the knock-and-announce rule has never protected . . . one's interest in preventing the government from seeing or taking evidence described in a warrant." *Hudson*, 547 U.S. at 594, 126 S. Ct. at 2165.

12

circumstances, the lack of a waiting period between announcement and entry was not unreasonable.

In sum, the officer's execution of the search warrant in this case did not offend any of the purposes underlying the knock-and-announce requirement. We therefore hold that the method of execution was constitutionally reasonable and that the district court did not err by denying Jacobson's motion to suppress evidence from the search.[5]

## II.

Jacobson contends that his confession during the search was involuntary and that it therefore should have been suppressed. "The Due Process Clause of the Fourteenth Amendment prohibits the admission into evidence of a statement that was not voluntarily given." *State v. Zabawa*, 787 N.W.2d 177, 182 (Minn. 2010). "The State must establish by a preponderance of the evidence that a statement was voluntary. [Appellate courts] review the totality of circumstances to determine whether the State met its burden to establish that a statement was voluntary." *State v. Morrow*, 834 N.W.2d 715, 725 (Minn. 2013) (citation and quotations omitted).

---

[5] Because the officers did not violate the knock-and-announce requirement, it is unnecessary for us to determine what if any remedy would be appropriate if there were a violation of the requirement. Nonetheless, we note that the Supreme Court has held that the exclusionary rule does *not* apply to violations of the knock-and-announce requirement. *Hudson*, 547 U.S. at 594, 126 S. Ct. at 2165. We are not aware of any binding Minnesota precedent rejecting *Hudson*. *See State v. Jackson*, 742 N.W.2d 163, 165, 178, 180 (Minn. 2007) (distinguishing the unannounced search in *Hudson* from the invalid nighttime search in *Jackson* and declining to address as unnecessary an argument that Minnesota should reject *Hudson* on state constitutional grounds). In sum, it is not clear to us that a violation of the knock-and-announce requirement requires suppression, but we leave that issue for another day.

> To determine the voluntariness of a defendant's statement, we ask whether the defendant's will was overborne at the time of his confession and examine whether police actions, together with the other circumstances surrounding the interview were so coercive, manipulative, and overpowering that the defendant was deprived of his ability to make an independent decision to speak. In making this inquiry, we consider factors such as the defendant's age, maturity, intelligence, education, experience, and ability to comprehend as well as the nature of the interview, including its length, the lack of or adequacy of warnings, whether the defendant's physical needs were met or ignored, and whether the defendant was denied access to friends.

*Id.* (citation and quotations omitted). Appellate courts "review de novo the district court's legal conclusion regarding whether the defendant's statement was voluntary, but accept the underlying factual determinations of the district court regarding the circumstances of the interview unless the findings are clearly erroneous." *Id.* (quotation omitted).

In this case, the district court's undisputed fact findings establish the relevant circumstances. At the time of the interview, Jacobson was approximately 50 years old and sufficiently intelligent to answer the officers' questions. The interview occurred in Jacobson's home, and his family remained in the home during the interview. The interviewing officers informed Jacobson that he was under arrest and would be charged with first-degree conspiracy to distribute methamphetamine. The officers read Jacobson his *Miranda* rights. Jacobson told the officers that he understood his rights and would answer their questions. Jacobson did not request an attorney.

The interview lasted approximately 45 minutes, during which the officers offered Jacobson water and soda and did not deprive him of any physical needs. The officers did

14

not threaten Jacobson, physically intimidate him, or make him any promises. The officers testified that Jacobson did not appear to be impaired and that he understood their questions. Jacobson initially denied dealing methamphetamine, but he eventually admitted that he sold methamphetamine earlier that day, after the officers questioned him about the federal buy-fund money in his wallet. The interview ended after Jacobson rejected an offer of "consideration" on his criminal charges in exchange for his future cooperation with an investigation regarding his supplier.

The circumstances do not suggest that Jacobson's will was overborne when he confessed to selling methamphetamine. Although Jacobson did not confess to the drug sale until after the agents questioned him about the federal buy-fund money in his wallet, the agents' approach was not improper. *See State v. Pilcher*, 472 N.W.2d 327, 334 (Minn. 1991) (stating that it was not improper for law enforcement officers to inform a defendant of the evidence against him).

Jacobson argues that his statements were involuntary because "fifteen armed officers had just swarmed his property to execute the search warrant at night," he was not free to leave and was under arrest, three officers questioned him alone in a back room, his family members were detained in another room during his interrogation, and the officers "brought up his family and him going to prison but said that he could get 'consideration' presumably if he talked." Those circumstances do not lead us to conclude that Jacobson's will was overborne. Although 15 officers were on the property, only three questioned Jacobson. Moreover, the fact that the interview may have been unpleasant for Jacobson does not necessarily indicate that his statement was involuntary. *See State v.*

15

*Ritt*, 599 N.W.2d 802, 810 (Minn. 1999) (noting that although an interrogation "may have been unpleasant" for the defendant, "there [was] little indication that her will was overborne").

As to his family's detention and the officers' mention of his family during the interview, threats or promises regarding a suspect's family members during an interview may render a confession inadmissible. *See Lynumn v. Illinois*, 372 U.S. 528, 531, 534, 83 S. Ct. 917, 919, 920 (1963) (concluding that a confession was involuntary where police told the defendant, who had no previous experience with the criminal justice system, that if she did not cooperate she would lose financial aid for her children, her children might be taken from her, and she may never see them again); *State v. Anderson*, 298 N.W.2d 63, 65 (Minn. 1980) (noting that "a promise to free a relative in exchange for a confession may render a confession inadmissible"). But Jacobson does not assert that the officers made threats or promises regarding his family members. He simply notes that the officers told him, "you'll do what you gotta do to help you, help your family out and provide for them." But that reference to Jacobson's family members occurred *after* Jacobson admitted the drug sale.

As to the agents' offer of "consideration" in exchange for Jacobson's future cooperation with an investigation regarding his supplier, "[c]ourts look with disfavor on implied and express promises made by the police during interrogation, but such promises do not automatically render a statement involuntary." *State v. Clark*, 738 N.W.2d 316, 333 (Minn. 2007). But in this case, the agents did not make any promises during the interview. In fact, they told Jacobson that they could not make him any promises.

16

Moreover, the agents did not offer consideration to induce a confession; the agents offered consideration in exchange for Jacobson's future cooperation *after* he confessed to selling methamphetamine. Lastly, Jacobson's refusal to cooperate with an investigation regarding his supplier shows that his will was not overborne. *See State v. Williams*, 535 N.W.2d 277, 288 (Minn. 1995) (noting that defendant's behavior of standing up to interrogators "evinces his ability to withstand pressure").

Jacobson also argues that his "ability to comprehend was impaired because he had used meth earlier that day." Intoxication is a factor that may be considered in determining whether a defendant's will has been overborne, but is not necessarily proof of involuntariness. *Zabawa*, 787 N.W.2d at 183. The district court's fact findings note that the agents testified that Jacobson did not appear to be impaired and that he appeared to understand all of their questions. The district court found that Jacobson acknowledged that he understood his *Miranda* rights and that Jacobson was "of sufficient intelligence to be able to consciously and knowingly answer the questions posed by Agents Museus and Newhouse." In sum, the district court's findings refute Jacobson's claim that methamphetamine use impaired his ability to comprehend.

Given the totality of the circumstances, the state met its burden to establish by a preponderance of the evidence that Jacobson's confession was voluntary. The district court therefore did not err by denying Jacobson's motion to suppress his statements.

**Affirmed.**